IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MAGDA M. ZIDAN                    *

V.                                *   CIVIL NO. SKG-10-1792

STATE OF MARYLAND,                *
DEPARTMENT OF PUBLIC SAFETY
AND CORRECTIONAL SERVICES         *


MEMORANDUM OPINION

Plaintiff Magda Zidan filed a complaint asserting race, national origin, religion and ethnicity based discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), et seq. and 42 U.S.C. § 1981 against the Maryland Department of Public Safety and Correctional Services. On September 14, 2010, defendant filed a motion to dismiss, or in the alternative, for summary judgment. (ECF No. 7). The motion was granted as to all Counts, but Count III (religious discrimination under Title VII), to allow "discovery . . . to determine whether a hostile work environment exists and whether any act was committed during the limitations period that contributed to the hostile work environment." (ECF No. 19). On December 15, 2011 defendant filed another motion for summary judgment (ECF No. 39) which is fully briefed. Neither party asked for a hearing. No hearing is necessary in this case.

Local Rule 105.6.  For the reasons set forth below, this Court
GRANTS defendant's motion.

**I.    Background**

**A.    Factual**

The essential facts of the case, either undisputed or,
where disputed, recited in the light most favorable to plaintiff
as the non-movant, are as follows.

Plaintiff is Egyptian (ECF No. 39-2, 2), and is a
practicing Muslim who wears a hair cover as part of her
religious practice.  (ECF No. 39-2, 5).  She was previously
employed at Allegany Detention Center.  (ECF No. 39-2, 2).
Plaintiff completed an application for employment at the North
Branch Division Correctional Institution ("NCBI"), a maximum
security correctional facility.  (ECF No. 39-2, 3).

Plaintiff received a written notice dated March 5, 2008
that she had been appointed to NCBI as a Correctional Dietary
Officer I (ECF No. 39-3, 1).  Her employment was effective March
24, 2008 for a 6-12 month probationary period to be followed by
permanent employment status.  (Id.).  The appointment
notification letter required plaintiff to participate in pre-
service training, attend the training academy for five weeks,
meet various standards, and complete pre-employment paperwork
with a personnel associate.  (ECF No. 39-3, 1-2).  There is no
dispute that plaintiff failed to successfully graduate from the

training academy, a prerequisite for Correctional Dietary
Officer I.  (ECF No. 39-5, 8).

    After receiving the notification letter, plaintiff met with
Sharon Peters, regarding the required uniform for dietary
officers.  (ECF No. 39-2, 4).   Ms. Peters is the personnel
officer working with Warden Rowley at NCBI.  (ECF No. 39-4, 4).
Ms. Peters informed plaintiff that she would have to remove her
hair cover for work.  (ECF No. 39-2, 5).  Plaintiff responded
that she was required to wear her hair cover as part of her
religion as a practicing Muslim.  (Id.).

    Before plaintiff began work at NBCI, she was told to come
to meet with Ms. Peters for an "emergency interview."  (ECF No.
44, Zidan Deposition Excerpts, 49).[1]  At the "emergency
interview," plaintiff was told that she could not wear her hair
cover and that a request for a uniform accommodation would have
to be submitted to headquarters in Baltimore.  (ECF No. 44,
Zidan Deposition Excerpts, 51-52).  She was photographed wearing
her hair cover.  (ECF No. 39-2, 10).   Plaintiff was given a
list of nine questions about her religious beliefs and
practices, how the practices conflicted with departmental policy
and the type of accommodation sought.  (ECF No. 39-6).  Ms.
Peters notified plaintiff that the questions were necessary so

---

[1] ECF No. 44 was not paginated in accordance with the Court's system
and therefore page numbers reflect those numbers internally assigned
by the court reporting service.

that a committee could decide whether or not to grant the exception to the dress code.  (ECF No. 39-5, 2). The list was emailed by Lisa Wood, Human Resources Director, to Ms. Peters, to be answered by plaintiff. (Id.).  Plaintiff stated that as a practicing Muslim, she is required to cover her hair and cannot let anyone see her body or hair. (ECF No. 39-7).   Plaintiff requested that she be inspected by a female officer, as necessary for security purposes, and stated that she had worked at Allegheny detention center previously and had no problems wearing her hair cover there.  (Id.).

On April 4, 2008, plaintiff's first day of work, she was advised that she would not be allowed to work until she obtained "security clearance" because it was possible her hair cover could be used to smuggle weapons or drugs into the facility (ECF No. 39-2, 10-11) or could be used by an inmate to strangle her and generally did not comply with NBCI security procedures. (ECF No. 44, Peters Deposition Excerpts, 75, 87).  Subsequently, during her shifts, plaintiff was directed to sit in a locked office adjacent to the kitchen, where she was only allowed to leave if escorted by a correctional officer.  (ECF No. 44, Zidan Deposition Excerpts, 140-41).  She said she had trouble signaling to let an officer know when she needed to use the restroom or eat.  (ECF No. 39-2, 19).  She was not issued handcuffs or mace like other correctional officers and had to be

4

with another certified officer at all times.  (ECF No. 39-2,
13).

During the initial two and a half months, plaintiff was
also allowed in the kitchen to observe while another officer was
in charge of the inmates who were preparing food.  (ECF No. 39-
2, 14-15).

Plaintiff states that from the first day she was in the
kitchen office, she was continually laughed at and questioned by
co-workers approximately every other day up to four times a week
for the first two and a half months of her employment.  (ECF No.
44, Zidan Deposition Excerpts, 118-20, 124).   Plaintiff did
not know the names, ranks or physical descriptions of the
officers that had laughed at her, but believed it was four
female officers. (ECF No. 44, Zidan Deposition Excerpts, 122-
24).  The officers would say things like, "What's wrong with
you? What is wrong with you? Why are you sitting like that? When
are you going to come and work?" (Id.).  The questioning
occurred every other day, but the officers did not directly
mention plaintiff's religion or hair cover.  (ECF No. 44, Zidan
Deposition Excerpts, 125-27).  No managers or supervisors
witnessed the questioning.  (ECF No. 44, Zidan Deposition
Excerpts, 124).  Plaintiff did not report these incidents to
management.  (ECF No. 44, Zidan Deposition Excerpts, 127).
Plaintiff stated that no mention was made about her religion,

but that she felt her treatment was hostile because of the way the questions were asked and because she was sitting there due to her hair cover.  (ECF No. 39-2, 20-21).

Plaintiff complained to Ms. Wiley, Correctional Dietary Supervisor (ECF No. 39-2, 12), that she needed work to do, felt that she couldn't breathe in the kitchen, and that everyone else was able to do work except her.  (ECF No. 39-2, 21).  Plaintiff felt that she had a good relationship with her managers, Mike Yacenech and Mr. Troy, and felt that they treated her well. (ECF No. 39-2, 19).

At some point,[2] possibly late June, Ms. Peters gave plaintiff material to fashion to the back of a standard uniform cap to cover her hair.  (ECF No. 44, Zidan Deposition Excerpts, 85-86; ECF No. 39-5, 6).  At that time the security clearance issue was not yet resolved.  (ECF No. 44, Zidan Deposition Excerpts, 87).

Plaintiff was transferred to the personnel office for approximately two and a half months.  (ECF No. 39-2, 21). Plaintiff was in the personnel office after she twice failed the academy testing while awaiting a decision as to whether she would be allowed to test a third time.  (ECF No. 39-5, 11).  She was told to sit in a chair in Ms. Peter's office, where she was

---

[2] Plaintiff's and Ms. Peters' testimony are both unclear as to the time frame when plaintiff made and began using the modified hair covering.

assigned some light filing pending the approval of her hair cover. (ECF No. 44, Peters Deposition Excerpts, 82-83). In addition to filing, plaintiff was given space to study for the training academy while they were waiting to hear if she would be allowed to re-take the academy test a third time. (ECF No. 39-5, 9). Plaintiff was allowed to ". . . walk up and down the hall, go do anything she wanted, go out for lunch if she wanted. . . and she helped [Ms. Peters] while [she] was working. . ." (Id.).

In the personnel office plaintiff was questioned by several people when they would go in or out of the office and she would cry afterwards. (ECF No. 39-2, 22). Plaintiff stated she was questioned, "What is wrong with you? Why are you crying like that?" but that nothing was said about her being Muslim. (Id.).

Officer Lohr, Corporal Correction Officer II for Western Correctional Institute ("WCI") (ECF No. 44, Lohr Deposition Excerpts, 8), stated that he saw plaintiff in the personnel office three to four times, appearing anxious and distraught. (ECF No. 44, Lohr Deposition Excerpts, 9-10). Ms. Peters suggested to Officer Lohr that he talk to plaintiff because she might need help. (Id.). Plaintiff told Officer Lohr that she was upset because she had left her job at the Allegheny Detention Center to work at NBCI and that it "bugged her a lot" that she had pass the academy again. (ECF No. 44 Lohr Deposition

Excerpts, 15).  Plaintiff stated that she didn't see why her hair cover was a "big deal."  (Id.).   Officer Lohr stated he saw her wearing the modified cap and that plaintiff said she was not allowed to wear her hair cover because they were afraid she might hide things in it.  (ECF No. 44, Lohr Deposition Excerpts, 12).

In one instance, plaintiff was in the parking lot between NBCI and the WCI when a motorcyclist officer yelled at her, "What in the hell on your head? What the hell is this on your head?"  (ECF No. 39-2, 22-23).[3]  As a result she went home crying.  (Id.).  Plaintiff stated she did not file a formal complaint, but stated that she "talked to Ms. Sharon Peters [after]."  (Id.).

Ms. Peters testified that she gave plaintiff names of whom to contact if she felt she needed to file a complaint.[4] (ECF No. 44 Peters Deposition Excerpts, 85-86).   Ms. Peters stated that plaintiff told her she felt discriminated against because she was not able to work on the kitchen floor or carry the tools like other officers.  (Id.).

---

[3] Plaintiff's testimony is unclear as to when this event occurred and as to whether the motorcycle officer was from NCBI or WCI. (ECF No. 39-2, 22).
[4] The record does not reflect whether or not "complaint" referred to a discrimination complaint, nor is there any mention of religious discrimination.  Additionally, the record is not clear as to whether or not Ms. Peters was plaintiff's manager for reporting grievances.

While employed at NBCI plaintiff received four "Monthly Rating for Probationary Employees" evaluations, signed by Officer Wiley and plaintiff, for the rating periods: (1) March 23, 2008 to April 23, 2008, (2) April 24, 2008 to May 23, 2008, (3) May 24, 2008 to June 23, 2008, and (4) June 24, 2008 to July 23, 2008. (ECF No. 39-9, 1-4).   Plaintiff stated that she was forced to sign the performance evaluations and one evaluation was done while she was in Ms. Peters' office. (ECF No. 44, Zidan Deposition Excerpts, 93).  The first two evaluations were both signed on May 29, 2008 and state that plaintiff was training to learn areas of the kitchen and was meeting standards. (ECF No. 39-9, 1-2).

On June 23, 2008, plaintiff had begun the academy training program for certification as a correctional dietary officer at NBCI. (ECF No. 7-5, 1).   Ms. Peters testified that the delay in admission to the training academy was due to a backlog caused by a high volume of applicants. (ECF No. 39-5, 7).  Plaintiff was dismissed from the training on June 27, 2008 for failing Block Test #1A, and failing the re-test #1B.  (ECF No. 7-5, 1).

Plaintiff's third evaluation, signed on June 26, 2008, stated she needed improvement in work quality and habits, was told not to chew gum or wear jewelry near food service, needed to speak to inmates in "American language," and should notify supervisors "when she has a problem with her post." (ECF No. 39-

9, 3).   Despite plaintiff's noted problems, she met overall standards for that month's probationary period.   (Id.).

On July 21, 2008 plaintiff was readmitted to the training program but was dismissed again on July 29, 2008 for failing three out of four administered tests.   (ECF No. 7-5, 1-2).

On August 4, 2008 Warden John Rowley of NBCI formally requested that plaintiff be admitted to the training program for a third time.   (ECF No. 7-6, 1-2).   Despite initial approval (ECF No. 7-7), the request was subsequently rescinded in August, 2008 because Commission regulations authorize only one reinstatement and plaintiff had twice failed training.   (ECF No. 7-4, 4).   Plaintiff was notified that she would be terminated at the end of the work day on August 28, 2008 for failing to complete the training academy.   (ECF No. 39-4, 5-6). Plaintiff's fourth evaluation signed on August 13, 2008 stated that plaintiff needed improvement in all measurable areas because of unprofessional behavior, lack of focus, and negative behaviors.   (ECF No. 39-9, 4).

Although plaintiff wore a modified cap to cover her hair, she did not receive approval to wear her religious hair scarf during her employment.   (ECF No. 44, Zidan Deposition Excerpts, 85-87).   The modified cap was found to comply with the uniform policy after approval by plaintiff's mosque.   (ECF No. 39-5, 8). Ms. Peters testified that the delay in approving plaintiff's

religious headwear accommodation request was because the review board had not met.[5] (ECF No. 39-5, 5).  Plaintiff received full wages and employee benefits throughout the full term of her employment.  (ECF No. 39-5, 9).

On June 8, 2009, plaintiff filed an EEOC Form 5 (5/01) for discrimination based on race, religion, and national origin. (ECF No. 39-10, 1).

## II.   Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970) (moving party must initially show "the absence of a genuine issue as to any material fact").  Materiality is determined by the substantive law pertaining to a particular claim.  Anderson v. Liberty Lobby, 477 U.S.  242, 248 (1986).

Once the moving party has met this requirement, the burden shifts to the nonmoving party to prove there is a genuine issue for trial and that evidence exists to prove the elements of the

---

[5] Plaintiff does not contest that the reason for the lack of decision on her accommodation request was the delay in a meeting of the review board or the delay in beginning the academy was the volume of new applicants, nor does plaintiff argue that either delay was motivated by religious discrimination. Moreover, there is not a claim filed for disparate treatment before the Court.

party's substantive law claims.  Fed. R. Civ. P. 56(e); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 321 (1986); <u>Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Sylvia Development Corp. v. Calvert County</u>, 48 F.3d 810, 817 (4th Cir. 1995).  To survive summary judgment, the non-moving party must produce "specific facts showing that there is a genuine issue for trial," and may not rest upon the "bald assertions of [its] pleadings."  Fed. R. Civ. P. 56(e); <u>Matsushita</u>, 475 U.S. at 586.

The role of the Court at the summary judgment stage is not to "weigh the evidence and determine the truth of the matter," but rather to determine whether "there are any genuine factual issues that can properly be resolved only by a finder of fact because they may be resolved in favor of either party." <u>Anderson</u>, 477 U.S. at 249-50.  Evidence submitted both in support of and in opposition to a motion for summary judgment must be admissible and based on personal knowledge.  Fed. R. Civ. P. 36; <u>Celotex</u>, 477 U.S. at 323-24; <u>Williams v. Griffin</u>, 952 F.2d 820, 823 (4th Cir. 1991).

### III. Analysis

Plaintiff asserts that she was subject to religious discrimination because as a practicing Muslim she is required to wear a *hijab*, or hair cover, and but for her hair cover, ". . . she would not have been subjected to the illogical 'security'

12

measures . . . for four months." (ECF No. 44, 9). Plaintiff claims that the "illogical security measures" created a hostile work environment in that she was isolated in a locked office for nearly three months (ECF No. 44, 5), was repeatedly laughed at and humiliated by other officers (Id.), was not allowed to carry the tools and weapons given to other officers (ECF No. 44, 6), and was not given any meaningful work to do. (ECF No. 44, 7).

Defendant raises two arguments in support of summary judgment: (1) plaintiff's claim was untimely filed (ECF No. 48, 3) and (2) even if the claim is not time barred, plaintiff cannot satisfy the elements of a religious discrimination claim. (ECF No. 48, 4-15).

## A. Applicable Law

Racial, religious or national origin harassment which creates a "hostile work environment" is actionable under Title VII because it amounts to discrimination in the conditions of employment. See Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 63-68, 106 S.Ct. 2399, 2403-06 (1986). "Since an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action." E.E.O.C. v. R & R Ventures, 244 F.3d 334, 338 (4th Cir. 2001).

The Fourth Circuit has established a high standard for hostile work environment claims because "Title VII was not designed to create a federal remedy for all offensive language

and conduct in the workplace." Hopkins v. Baltimore Gas and Elec. Co., 77 F.3d 745, 754 (4th Cir. 1996). The Court must ". . . distinguish between those situations that indeed present serious impediments to minority and female workers and those situations when human nature simply is not at its best." Ziskie v. Mineta, 547 F.3d 220, 229 (4th Cir. 2008).

To survive a motion for summary judgment on a hostile work environment claim, a plaintiff must make more than general allegations and must substantiate the accounts with ". . . specific dates, times or circumstances." Carter v. Ball, 33 F.3d 450, 461-62 (4th Cir. 1994).

**B. Analysis**

In order to prove a hostile work environment, a plaintiff must ". . . demonstrate that the harassment was (1) unwelcome, (2) because of religion, (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere, and (4) imputable to the employer." E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306, 313 (4th Cir. 2008).

There is no dispute that plaintiff found the alleged conduct to be unwelcome, satisfying the first element for a hostile work environment claim. Plaintiff alleges that the second element is met because it is "self-evident that 'but for' the fact that [Plaintiff] is Moslem and required to wear a head scarf, she would not have been subjected to the illogical

14

'security' measures undertaken by Defendant for months." (ECF No. 44, 9). Plaintiff states that under the third element, the conduct was severe and pervasive because she was isolated in a locked room, restricted from job duties, and regularly laughed and gawked at by co-workers. (ECF No. 44, 11-12). Finally, as to the fourth element, plaintiff asserts that the harassment is imputable to defendant because plaintiff had complained to Ms. Peters about her treatment. (ECF No. 44, 14 n.3).

Defendant argues that the claim is time barred (ECF No. 48, 3), and in the event that it were not time barred, plaintiff still fails to meet the second, third and fourth elements of a hostile work environment claim. Defendant argues that the actions taken were routine security measures and also a result of her failure to complete training, not motivated by any religious animus. (ECF No. 48, 4-6). Further, defendant asserts that the alleged actions were not severe or pervasive in accordance with Fourth Circuit precedent. (ECF No. 48, 11-13).

## 1. Plaintiff's claim is not time barred

A plaintiff must file a charge of discrimination with the EEOC or other EEOC recognized enforcement agency within 300 days of when the alleged unlawful employment practice occurred. 42 U.S.C.A. § 2000e-5(e)(1). Defendant asserts that the time limitation for plaintiff's EEOC claim filed on June 8, 2009 extends back to August 12, 2008, and that plaintiff has failed

to assert an actionable violation after August 12, 2008.  (EFC No. 48, 3).  Plaintiff does not dispute the August 12, 2008 date for limitations purposes, but asserts that the underlying alleged discriminatory conduct occurred continuously throughout her entire employment, constituting "one unlawful employment practice" that continued until her termination on August 28, 2008.  (EFC No. 44, 9).  The Court agrees.

In National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 115, 122 S.Ct. 2061, 2077 (2002) the Court concluded that "a charge alleging a hostile work environment claim will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period."  Workplace harassment is considered a continuing violation and therefore a claim is timely if any of the predicate contributing facts occurred within the 300 day time limitation.  Gilliam v. S.C. Dep't of Juvenile Justice, 474 F.3d 134, 140 (4th Cir. 2007).  The Supreme Court explained the unique nature of hostile work environment claims in that "[t]heir very nature involves repeated conduct.  The 'unlawful employment practice' therefore cannot be said to occur on any particular day.  It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." Morgan, 536 U.S. at 115, 122 S.Ct. at 2073.

(internal citations and quotations omitted).  In order for the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment.  Id. at 118, 122 S.Ct. at 2075.

Moreover, "[u]nder the continuing violation doctrine, none of the [a]cts had to be discriminatory in and of itself. It was only necessary for one of these acts to contribute to the behavior relating to the incidents that occurred prior to the limitations period." Gilliam, 474 F.3d at 141.

Plaintiff alleges she was arbitrarily segregated from co-workers, laughed and stared at by co-workers, and prevented from performing her job duties continuously throughout the entire term of her employment.  (EFC No. 44, 7-8).  Defendant argues that plaintiff has failed to identify a specific act within the limitations period that contributed to the hostile work environment. (EFC No. 48, 3).

Plaintiff testified in deposition that the alleged offensive conduct continued up until termination on August 28, 2008 and therefore included conduct after August 12, 2008.  (ECF No. 39-2, 15, 24).  Thus, in viewing the evidence in light most favorable to the plaintiff, plaintiff's claim for hostile work environment is not time barred.

**2. There is no sufficient evidentiary basis that the alleged harassment was because of her religion to defeat summary judgment.**

To establish religious discrimination, plaintiff must show that "but for" her religious beliefs the conduct would not have occurred.  Hostility is not in and of itself dispositive of discrimination, and ". . . harassment due to personality conflicts will not suffice" to establish discrimination.  <u>Ziskie v. Mineta</u>, 547 F.3d 220, 226 (4th Cir. 2008); <u>Honor v. Booz-Allen & Hamilton, Inc.</u>, 383 F.3d 180, 191 (4th Cir. 2004) (summary judgment was affirmed where plaintiff might have been able to show that supervisor was hostile toward him, but plaintiff conceded that no one in the workplace used racial epithets, racial slurs, racially derogatory terms or stereotypes with respect to him or others).

Plaintiff concedes that no one made racial or religious slurs, or comments about her religion. (ECF No. 39-2, 17, 19). Plaintiff testified the comments from her co-workers were, "What are you doing?" "What's wrong with you?" and "Oh, we wish that we can sit like you, not doing nothing, get paid, and you sitting here crying." (ECF No. 39-2, 17).  These comments do not imply religious animus but merely comment on plaintiff's behavior.  Plaintiff testified that the comments occurred when she was sitting in a chair crying. (ECF No. 39-2, 18).  Even assuming plaintiff was subject to hostility, these statements do not demonstrate religious animus.

Plaintiff points to an additional instance where a motorcycle officer questioned, "what the hell is that on your head?" referring to plaintiff's hair cover. (ECF No. 39-2, 22-23).[6] This isolated query about her religious garb by itself is certainly not enough to establish a hostile work environment and certainly does not infect the other comments with a religious overtone. Compare Harris v. Forklisft Sys., 510 U.S. 17, 21, 114 S.Ct. 367, 370 (1993) (a "mere utterance of an ... epithet which engenders offensive feelings in a[n] employee . . . does not sufficiently affect the conditions of employment to implicate Title VII."). Accordingly, the plaintiff has failed to provide sufficient evidence on this element of a hostile work environment claim to defeat summary judgment.

**3. There is no sufficient evidentiary basis that the alleged harassment was severe or pervasive to defeat summary judgment.**

As the Fourth Circuit noted in Sunbelt Rentals, "the task then on summary judgment is to identify situations that a reasonable jury might find to be so out of the ordinary as to meet the severe or pervasive criterion. That is, instances where the environment was pervaded with discriminatory conduct aimed to humiliate, ridicule, or intimidate, thereby creating an abusive atmosphere." 521 F.3d at 316; See also Jennings v. Univ.

---

[6] Any legal force of this isolated remark is further undermined by the fact that it was made on a single occasion in the parking lot, not her actual workplace by an individual with whom she did not work and who indeed may have worked for a different correctional institution - WCI.

of North Carolina, 482 F.3d 686, 695 (4th Cir. 2007); Meritor,

477 U.S. at 65, 106 S.Ct. 2399; Harris, 510 U.S. at 21, 114

S.Ct. at 126.

A plaintiff must clear a high bar in order to satisfy the

severe or pervasive test. E.E.O.C. v. Xerxes Corp., 639 F.3d

658, 676 (4th Cir. 2011) (citing EEOC v. Central Wholesalers,

Inc., 573 F.3d 167, 176 (4th Cir. 2009)).  To be sufficiently

severe or pervasive, the actions must reflect more than sporadic

or occasional instances or more than the kind of tensions that

accompany any stressful workplace environment.  Ziskie, 547 F.3d

at 228.  The Fourth Circuit has noted that the primary issue ".

. . is one of degree: any employee must be expected to

accommodate the normal run of aggravations that are part of

holding a job, but no employee should have to suffer severe or

pervasive [] bias . . ."  Id.

In proving the third element, the plaintiff must show that

the work environment was both subjectively and objectively

hostile so that a reasonable person would have found it so.

Bonds v. Leavitt, 629 F.3d 369, 385 (4th Cir. 2011).  The court

evaluates severity and pervasiveness under a totality of

circumstances test.  See Harris, 510 U.S. at 23, 114 S.Ct. at

371.  Relevant considerations for objectively hostile

environment include: the frequency of the discriminatory

conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. (Id.).

a)   **Frequency of conduct**

While an employer cannot lightly be held liable for single or scattered incidents, the court will evaluate the habitual use of epithets or view the conduct in light of its cumulative effect to determine liability.  Sunbelt Rentals, 521 F.3d at 318; Compare E.E.O.C. v. Xerxes Corp., 639 F.3d 685, 676-77 (4th Cir. 2011) (plaintiff's claim that he was subject to racial slurs by a co-employee, "a bunch of different times" at some point during his employment, was not supported by details, context, examples, or time frame and wasn't sufficient to sustain the hostile work environment claim), with Amirmokri v. Baltimore Gas & Elec. Co., 60 F.3d 1126 (4th Cir. 1995) (alleged harassment was sufficiently pervasive when on an almost daily basis for a period of six months, plaintiff was called names like "the local terrorist," a "camel jockey" and "the Emir of Waldorf").

Here, plaintiff claims that co-workers would "gawk at, make jokes, and laugh at" her on a daily basis (ECF No. 44, 11-12; ECF No. 44, Zidan Deposition Excerpts, 151) and in one instance a motorcyclist officer asked, "what the hell is that on your head?" (ECF No. 39-2, 22).  In viewing the allegations in the

light most favorable to the plaintiff, regular and consistent questioning by co-workers and a single pointedly religious question from a motorcycle officer could be viewed as frequent.

**b)    Severity of conduct**

To be severe by an objective, reasonable standard, the actions must go beyond "simple teasing" and offhanded comments so that it amounts to a change in the terms or conditions of employment.  Faragher v. Boca Raton, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).  Conduct must go beyond general communications or isolated incidents so as to alter terms of employment.  Compare Hartsell v. Duplex Products, Inc., 123 F.3d 766, 773 (4th Cir. 1997) (four trivial comments were insufficient to survive summary judgment on plaintiff's hostile work environment claim) with Okoli v. City of Baltimore, 648 F.3d 216, 220-21 (4th Cir. 2011) (fondling, kissing, repeated propositioning, describing sexual activities, and asking intimate questions were severe far beyond simple teasing).

In the instant case, plaintiff was subject to comments such as "What's wrong with you?" and on one occasion, "What the hell is that on your head?" (ECF No. 39-2, 22).  These comments fail to rise to the level of severity necessary under Title VII precedent, and accordingly, plaintiff's hostile work environment claim is subject to summary judgment on this basis too.

**c)   Physically threatening or humiliating conduct or mere offensive utterance**

"Normally petty slights, minor annoyances, and simple lack of good manners will not give rise to a hostile environment claim." Bonds v. Leavitt, 629 F.3d 369, 386 (4th Cir. 2011) (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S.Ct. 2405 (2006)).  But, degrading and humiliating conduct can establish severe or pervasive discrimination even if not physically threatening.  Jennings, 482 F.3d at 698. Plaintiff noted she went home crying after she was questioned by the motorcyclist officer.  (ECF No. 39-2, 23).   Plaintiff stated she was questioned by co-workers, "why are you crying?" and "why aren't you working?"  Plaintiff may very well have felt annoyed or offended when the other workers asked her about crying or why she was sitting in the chair.  Additionally, while being locked in a room with nothing to do could be humiliating, the circumstances as a whole do not rise to a level that the Court finds actionable.  Plaintiff was allowed in the kitchen to train and work with another certified officer (ECF No. 39-2, 14-15), was given some filing tasks in the personnel office, and was allowed to study for the academy while stationed in the personnel office.  (ECF No. 39-5, 9).  This is not the type of humiliation envisioned under the case law as violative of Title VII.

**d)     Interfere with work performance**

To be actionable, the Court must determine that the harassment interfered with the plaintiff's ability to perform her work and that the harassment would interfere with the work performance of a reasonable person.  <u>Paroline v. Unisys Corp.</u>, 879 F.2d 100, 105 (4th Cir. 1989), (vacated in part on other grounds), 900 F.2d 27 (4th Cir. 1990) (en banc).

Plaintiff argues that her work performance was affected because she was not "allowed" to complete training or to assume the duties of a dietary officer (ECF No. 44, 6, 13).  Plaintiff argues that other non-Muslem officers were allowed to assume duties before completing training (ECF No. 44, 10) but has offered no evidence to support this isolated allegation. Moreover, plaintiff does not dispute that she twice failed the academy, which led to her termination.  (ECF No. 39-4, 1-2). Additionally, the Court dismissed plaintiff's wrongful termination claim, noting that plaintiff did not deny that she failed to pass the test and "whether or not she pass the test is an objective fact."  (ECF No. 19).

Ms. Peters and Parrish Kammuf, Manager of the NBCI Dietary Department, testified that a Correctional Dietary Officer I cannot assume full duties if he or she has not completed the training academy.  (ECF No. 39-5, 8; ECF No. 39-8, 2).   This policy applies to all officers uniformly. (ECF No. 39-5, 8).

Defendant has shown that COMAR regulations only allow for one reinstatement to the training academy (ECF No. 7-9, 1) and that plaintiff was terminated for failure to pass the academy.  (ECF No. 39-4, 1-2).  Defendant has provided evidence to show that the affected aspects of plaintiff's job performance (not able to oversee inmates, shadowed by another officer at all times, not able to carry mace or carry handcuffs) were a result of her failure to complete training and legitimate security concerns.  (ECF No. 48, 5-9; ECF No. 39-8, 2).  Plaintiff has not met her burden to show that defendant's reasons were a pretext for discrimination.

While plaintiff cried frequently (ECF No. 39-2, 21) and appeared distraught and anxious (ECF No. 44, Lohr Deposition Excerpts, 10), she does not argue an adverse impact on her job performance resulting directly from comments from co-workers.  Rather she argues that the "illogical security" rules affected her ability to do the duties of a dietary associate and put her in the humiliating position which attracted the comments and gawking.  However, she has produced no evidence that these so called "illogical security measures" were motivated by religious animus.

Even when viewed in light most favorable to plaintiff, the evidence does not demonstrate that the work environment was so

objectively hostile, as to alter the terms and conditions of her employment.

**4.   The state of the record is inconclusive as imputation of liability to employer.**

To establish employer liability in a hostile work environment claim, the plaintiff must show that the employer ". . . knew or should have known of the harassment and failed to take prompt remedial action reasonably calculated to end the harassment." Amirmokri, 60 F.3d at 1131 (quoting Katz v. Dole, 709 F.2d 251, 256 (4th Cir. 1983).  A plaintiff claiming harassment by a co-worker must make a concerted effort to notify the employer that a problem exists.  Xerxes Corp., 639 F.3d at 674.

A plaintiff can establish a triable issue of employer notice by showing evidence of repeated complaints to supervisors or managers.  Sunbelt Rentals, 521 F.3d at 320.  If the employer has a comprehensive system to report abuse that is available to plaintiff and plaintiff does not file a complaint, the employer can show lack of knowledge.  Davis v. Dimensions Health Corp., 639 F.Supp.2d 610 (D. Md. 2009).

"Once the employer has notice, then it must respond with remedial action reasonably calculated to end the harassment. Our precedents have long defined the basis for imposing liability under element (4) as being that after having acquired actual or

constructive knowledge of the allegedly harassing conduct, the employer had taken no prompt and adequate remedial action to correct it." <u>Xerxes</u>, 639 F.3d at 669 (internal citations and quotations omitted).

Plaintiff argues that "Ms. Peters, Defendant's Human Resources Manager,[7] was not only aware of the underlying hostile environment, but participated in the demeaning and humiliating conduct. . . [and plaintiff] filed a complaint about the hostile environment before her employment was terminated, and she testified that she complained to Ms. Peters about the demeaning and humiliating conduct." (ECF No. 44, 14 n.3).

Plaintiff states that she complained to Ms. Peters about the comments from her co-workers (ECF No. 39-2, 22) and also about the comment from the motorcycle officer (ECF No. 39-2, 23) but did not file any written complaints. (ECF No. 39-2, 24).

Ms. Peters' testified that she was not aware of any formal complaint or grievance filed by plaintiff but that she notified plaintiff whom to contact if she wanted to file a complaint. (ECF No. 39-5, 7). Ms. Peters testified that plaintiff was upset because she was not allowed to work on the floor or have the tools that the other officers carried. (ECF No. 44, Peters Deposition Excerpts, 86). However, the record, including

---

[7] Ms. Peters was noted as Warden Rowley's Personnel Officer (ECF No. 39-3, 2) but it is unclear whether she was a supervisor or manager of plaintiff at any point.

27

plaintiff's deposition testimony, contains no evidence that she mentioned religious discrimination.

The evidentiary record and the legal arguments are not fully developed on this element.  Even if Ms. Peters' was in fact plaintiff's supervisor, there is the further legal question whether a verbal unspecified complaint could be construed as constructive notice and whether the employer, through Ms. Peters, fulfilled its duty by referring plaintiff to the complaint policy.  But because plaintiff has failed to show that the alleged conduct was due to her religion or that it was sufficiently severe or pervasive, the question of imputed liability need not be reached.

In sum and most critically, the Court finds that there is insufficient evidence that the incidents plaintiff alludes to were attributable to her religion.  Plaintiff has failed to show that the defendant's legitimate, non-discriminatory reasons, for why plaintiff was restricted from performing her job duties were a pretext for discrimination.  While one may criticize the defendant for the delay in review of her accommodation request and the waste in assigning plaintiff to sit in a locked room with little or nothing to do - there is no evidence that any action or inaction was taken due to her religion and, of course, her failure to pass Academy training was an independent, unchallenged basis for her inability to undertake the duties of

Correctional Dietary Officer I.  Furthermore, even assuming that the comments were religious-based, plaintiff is unable to meet her burden in establishing that the comments from co-workers were sufficiently severe or pervasive to establish a hostile work environment.  Because plaintiff cannot establish the second and third elements of a hostile work environment claim, summary judgment is appropriate.

## IV.  Conclusion

Accordingly, for the foregoing reasons, defendant's motion for summary judgment is GRANTED.

Date: 7/17/12 _____                         /s/
                                     Susan K. Gauvey
                                     United States Magistrate Judge